Good morning, your honors. May it please the court. My name is John Ella. I represent the appellant Walter Engelhardt in this matter. Sixty seconds is how long it took respondent Timothy Buchholz to fire Walter Engelhardt after being copied on an email with Mr. Engelhardt's name in the subject line. Mr. Buchholz did not know that Mr. Engelhardt was back working at CenturyLink before he received the email. I say back at CenturyLink because Mr. Engelhardt was fired three times from CenturyLink, which also includes Qwest. There was a corporate merger. One might almost think they were toying with Mr. Engelhardt. This case involves Mr. Engelhardt's claim that his termination was unlawful retaliation under the Fair Labor Standards Act. The statute actually says that it's unlawful for a person to discharge or in any way discriminate against an employee for filing an FLSA claim or testifying in an FLSA proceeding. Mr. Engelhardt did both. Your preamble just assumes what for me is the most difficult issue when you say he was fired three times. The first time he was an employee of Qwest, right? Correct. The last two times he was not. Unless you can prevail on a very difficult issue. The joint employer issue. Our position, Your Honor, is the joint employer issue is not a necessary prerequisite to the FLSA claim because, as you pointed out, when he . . . That's true, but it's still a very relevant fact. Let me pursue that a little bit more. In the case of Mr. Engelhardt, he was fired in 2011 for a position with M.P. Nextel. Yes. M.P. Nextel serves as an independent contractor to various clients, right? Is there anything in the record about the expectations of either Nextel or Mr. Engelhardt as to where he would work when he was hired as a technician by them? I know from talking to my client that he just wanted to be in the St. Paul area, and he looked at working for other contractors. Did he apply for a job at that point to . . . Now, let's see. CenturyLink had acquired Quest by them early in 2011. I think so, yes. Did he apply for a technician position with them? I don't think that's in the record, no. And he did not apply with the understanding or expectation that Nextel would assign him to CenturyLink? I'm sorry, the expectation? The record does not establish or even address whether he was hired with the expectation or understanding that Nextel would assign him to CenturyLink. I think that was the understanding, but I'm not sure how much that's in the record. Now, when Nextel . . . is it in the record on the decision of Nextel in August of 2011 to assign him to CenturyLink? He was. I think that was always the understanding. He was assigned, yes, as it turns out, over the internal objection and later formal rejection by CenturyLink, but wasn't it Nextel's decision to assign him to CenturyLink? That would be my assumption. In part, in large part. I'm sorry. No, it would be my assumption that that was Nextel's decision. Obviously, it has to be accepted by CenturyLink, but Nextel decides which technicians to assign to which client, right? Subject to approval. Sure, but as for the . . . This all goes to where, particularly the joint employer issue, but it's also, I think, relevant to the circumstantial evidence of retaliation. That's what I was going to say, Your Honor, is I think what happened in 2011 is he was formally accepted by CenturyLink at that time, and he was working, we would say, as a joint employer. Because the internal opposition hadn't percolated. Hadn't percolated. That's the word I was going to use, Your Honor, and then it did. And then they said, we don't want him. Why is he working here? Why is he back? He's on a do not hire list. And then guess what? After Mr. Englehart challenged that, the company decided that he shouldn't have been on a do not hire list. And that's all . . . There is no link in that scenario, no obvious link to the FLSA preamble. All of that could have been happened by the development of a not for hire list based on the criteria that actually the defendant claims. Well, I would . . . And then on reconsideration, the shrinking of the ineligibility criteria to the point where the reason for his do not hire in September turns out to be forgiven by October. None of that has to be FLSA, and I think the district court was persuaded that there wasn't evidence that it was. This was going on with . . . to your respect, Your Honor, this was going literally at the same time the lawsuit was being settled, checks were being sent. It was still a very fresh issue . . . Where's the F? Where's the . . . Give me the record evidence of the link that the people involved in the acceptance and then rejection of this contractor technician . . . As I said . . . . . . were players in the ongoing settlement. Well, as I said, there's proximity in time. Okay. I don't think . . . I doubt that there's anything else, but I haven't studied the record, so I'm prepared to be enlightened. The comments themselves . . . no one at CenturyLink will have contact with Walt? I mean, that's pretty strong language coming right on the heels . . . I'm not familiar with that. And how does that link to the Brennan lawsuit? Well, two things. Proximity in time. Mr. Englehart was a very active participant in the lawsuit, and two, the company essentially conceded that there was no other valid reason for him to be on the do-not-hire list and that they should have rehired him and not fired him or not fired him. Was there any evidence that the do-not-rehire list was created as a result of the Brennan lawsuit? No one knows, Your Honor. But you have to have a little evidence, don't you, to make the link? Yes, Your Honor. But what I'm saying is we assert that it was, and they don't have a do-not-hire list in light of your letter saying this is retaliation. I don't think your assertion is enough. You might have some temporal proximity, but don't you need a little more than that? I think the strength of the comments that I just related, that no one at CenturyLink will have anything to do with Walt, within weeks or months of resolving this lawsuit that took, you know, mounds of paper and years to resolve and cost them money, where Mr. Englehart was deposed and his name appeared in the summary judgment order. Could you please give me a record cite for that, that nobody talked to Walt? Yep. That would help. It's an email that was accidentally sent to Mr. Englehart. He was accidentally copied on it. And it's appendix page 23637, and it's an email from a CenturyLink employee named Rich Nelson to someone named Bedard. Okay, those weren't players, though, in the Brennan aspect. Well, I think when he references he and anyone else at CenturyLink will have no contact, includes everyone at CenturyLink. I mean, it's pretty clear that the company is saying this guy, he's on a do not hire list, no contact, persona non grata. What other relationship did the dispute, did the sender and recipient of that email have? What other relationship? What was their, were they just employees, you know, chit-chatting about what their understanding was? I think they were laying down a pretty clear red line. Okay, was this a supervisor sending instructions? I thought not. There was also at the same time an email that said, why are we bringing this guy back, and this, I mean, I think that the retaliation is right in front of us there. Counsel, what about the, Mr. Englehart was rehired again as a contractor and terminated, and the basis for the termination the final time had to do with low productivity, that he was taking too long to make calls or to complete calls, or not getting enough of them completed, which has a facial logic to it that that would be a legitimate basis for termination. What's the proof that that was pretextual to go back to some prior dispute with him as opposed to being a current valid reason for an underperforming employee? Yes, Your Honor, I don't have very much time left, so this is the crux of the case, which is, you know, was there a pretext? And the basis for our argument that there's pretext, Your Honor, is the email that is copied on an email, and the email says, we're going to review concerns, address it, and investigate, and Buckholtz, who wasn't asked for his direction or opinion, jumps in and says within 60 seconds, send him home, dot, dot, dot, and that departs from any practice or policy or typical procedure for the company and the employees involved. There's no evidence in the record that Mr. Buckholtz ever did that with another employee, that he terminated someone within two weeks, that he was involved in termination at all, and certainly that he would jump in and cancel an investigation. There's no logical reason to cancel an investigation for a brand new employee. Why not look into what's going on? And he said on the record that it was not his job duty to terminate technicians, that he didn't want an investigation, and I think that under the shifting burden under the McDonnell Douglas test, that that's enough evidence, in fact, I think it's just obvious, and there's some direct evidence that Judge Loken raised up, that taken together, passes a summary judgment test to show that that was, that the productivity was pretext, and the decision maker was Buckholtz, and all he had, all he had was that email. Is there an A circuit case you would like to point us to that supports this pretext argument? Well, we've cited in our- Yeah, I mean, you know, no case is a cookie cutter from the previous case, or we wouldn't maybe need a court of appeals, but we've cited in the, in our brief the, I want to say the, well it's in our brief that there are more than one way to, ways to show that, to show that this was a pretext. It could be proximity time, it could be similar situated employees. But, you know, the factually relevant cases are, are a little . . . There's nothing that's particularly . . . More helpful than, you're never going to find anything on all fours in these, in these, these situations. I'd like to reserve my . . . Mr. Alla, one, one quick question. Sure. Were you able to find a comparator that had similarly low productivity as your client? Well, the discovery's a little murky, Your Honor, but I would, I would kind of flip down its head and say that this is kind of a sui generis situation. We just, we assert that no employee technician has been treated like this, where Buck Holtz, who's kind of like a colonel, jumps in to a discussion with a major and a lieutenant and a captain and says, fire that private, and, and cancels an investigation. I mean, the status, when he gets the email, is investigate, look into it, get back. And he says, no, cancel that, send him home, and, and that that's just never happened as a matter of practice or policy. Thanks, Your Honor. Thank you, Mr. Alla. Ms. Carver. Good morning, Your Honors. May it please the Court. I'm Beth Carver for the defendants, Central Inc. and Mr. Buck Holtz, both of whom asked that the Court affirm the grant of summary judgment in their favor. I think there are a few misstatements from plaintiff's opening argument that I probably should correct up front, and I think Judge Loken's questioning went to that. I heard plaintiff's counsel refer to him as a new employee in 2015. I heard references to Mr. Buck Holtz firing him. It wasn't an employee-employer relationship. It is for purposes of the FLSA. We're not arguing that he doesn't have standing under the FLSA, but he wasn't terminated by Central Inc. or by Mr. Buck Holtz in August 2015. He was sent home. And I think that is an important distinction. With respect to a plaintiff's retaliatory discharge claim. What is that distinction? Explain the meaning, the meaningfulness of that distinction. Well, because I think that plaintiff is relying on Central Inc.'s treatment of its own employees and contrasting that to its treatment of Mr. Buck Holtz, who was a contractor. And he says there's no evidence that they ever sent another employee, or Mr. Buck Holtz ever, no evidence that Mr. Buck Holtz was ever involved in terminating an employee as he was in these circumstances. And Mr. Buck Holtz said, he did say he didn't get involved in terminating contractors because it wasn't his role. He wasn't in the role of employer to contractors. But he did say that he had been involved in sending contractors home on a number of occasions. So I think that is an important distinction. He's saying, well, Mr. Buck Holtz, this is a violation of Central Inc.'s policies and practices and its standards. He terminated this guy and he doesn't terminate people. Is this a disputed fact? It's not a disputed fact, I don't think. And it is correct that the burden-shifting analysis of McDonnell Douglas v. Green applies here for the FLSA claim. That claim has a two-year statute of limitations. So what happened in 2011 with them saying, you're on the ineligible for rehire list, we have to send you home, that's beyond the statute of limitations with respect to the And to show pretext in a retaliation But not if he has, it's not to the Minnesota Whistleblower Act. Correct, Your Honor, that has a much longer statute of limitations. But we may get to that and we have to do it on our own then. Well, I can explain why the 2011 actions weren't, aren't evident. He doesn't have evidence of pretext with respect to 2011 either. This court has decided last month in the Naguib v. Trimark Hotel case that to prove pretext in a retaliation case, the employee has, the plaintiff must both discredit the asserted reason for the adverse action, and show that circumstances allow a reasonable inference that the real reason for the adverse action was retaliation. And here plaintiff wants to flip the burden of proof in this case, and I actually heard counsel say the word flip. His briefs are full of things. On a time barred point, you're not suggesting that the 2011 incident and circumstances would be inadmissible if the FLS, to a FLS, trial of the FLSA claim in 2015, right? Cuz it would clearly be relevant background. It would be relevant background. But he doesn't have a claim that he was retaliated against in 2011. I don't think that's even challenged on appeal. Yeah, that's correct, Your Honor. So his briefs are full of things that he claims that CenturyLink failed to identify. That CenturyLink failed to identify any contractors who were sent home in two weeks. That Mr. Buckle sent anybody home after having been on the job for less than two weeks. Or other contractors who were sent home for completing as few jobs as the plaintiff did. But CenturyLink met its burden here. When it came, when it proffered its legitimate non-retaliatory reason for sending plaintiff home in August 2015. And that was his poor productivity and that he was calling other, he was calling the union employees for CenturyLink for asking for help. It then was plaintiff's burden to establish pretext and that he, CenturyLink was actually motivated by retaliation. Plaintiff hasn't discredited CenturyLink's asserted reason for sending plaintiff home. It hasn't, he hasn't said that Mr. Berth's calculations of the jobs the plaintiff completed was inaccurate in any respect. And in fact, he was walked through in his deposition and his own records of the jobs he completed matched up with Mr. Berth's calculations. Nor has he otherwise demonstrated any issue of fact that would allow a jury to decide that CenturyLink's actions, its proffered reason for sending him home was pretextual. What about Buckholtz's intervention into the process of investigating the concerns? I think the important thing to remember is that- Isn't it a bit suspicious when, to use the counsel's analogy, you have a high ranking officer intervene in a hierarchy and dismiss a private? Your Honor, I don't think it is suspicious, and that's because Mr. Buckholtz did have ultimate authority to make those decisions. It was within his purview, and he did make decisions to send contractors home. And I think it's also important to remember that the whole process started when Mr. Berth, who had immediate supervision over the contractors in his area, he wasn't responsible for supervising them, that was a MP next level responsibility. But he had contractors within his area, and he noticed that the plaintiff's numbers were very low. So he checked it out, he ran the numbers, he showed them to his contemporary, Mr. Bosman, and they both agreed that he should be sent home. So the initial email says, he's not contributing to our workload, we think he should be sent home. Because Mr. Berth was new to CenturyLink at that point, he'd only been there for a few months, he sent the email to Mr. Fry, who was his immediate supervisor, Mr. Fry reports to Mr. Buckholtz. And he said, I want you to take a look at this, we think he's not contributing. Mr. Fry called Mr. Berth, found out that the plaintiff had also been calling CenturyLink's own employees. Added that to the email, sent it to Mr. Buckholtz and Ronell Shank. Ronell Shank is a CenturyLink employee who was the liaison with MP Next Level for the contractors. And he said something like, look into this, Ronell, do an investigation, let me know what you mean. And Mr. Buckholtz was copied on that email, and he said, send him home. And another thing that removes any suspicion from this is this happened at a time in August 2015 when CenturyLink was crazy busy. And they needed contractors, and they hire contractors who are already technicians. They don't do training of them. They go to a contracting agency, a service provider, and say, give me some service technicians, and they expect them to hit the ground running. And that didn't happen, and so Mr. Buckholtz's response was, we don't have time to monitor a low-performing contractor, just get him out of there, send him home. He didn't say fire him, he said send him home. And plaintiff hasn't come up with anything to show that there's anybody who did not engage in protected activity who was treated more leniently than he was. All he has is this anecdotal testimony of his friend, Charlie Howe. And it's important to remember that Mr. Howe was never an employee of CenturyLink. He was a contractor for CenturyLink off and on over a five year period through MP Next Level. So he doesn't have any institutional knowledge on the part of CenturyLink as to the reasons why employees or contractors were terminated. All he knows is what he's heard, just the grapevine. And it's necessarily incomplete because he's only worked for the one contractor. So he doesn't know what happened with other contractors that were provided by other service providers. So his testimony is, yeah, people were sent home for low productivity but after having a much larger window than the plaintiff was given. But he didn't offer any identifying information about those people. He didn't give names, he didn't give supervisors, he didn't say how long they worked, he didn't say what their rates of job completion was, so there's nothing. That doesn't satisfy the similarly situated comparator requirement. There's nothing for CenturyLink to refute. We can't say, well, no, that person actually worked for only two weeks and his job completion rate was lower. I mean, there's just nothing to refute. You can't just anecdotally say, yeah, somebody else was treated better than I. And contrary to plaintiff's claim, CenturyLink did have an interrogatory response, and this is in the record at 243-44. It identified 15 contractors who were off-boarded for productivity-related reasons. Plaintiff came back and said, well, one of those people was, he was terminated for insubordination, Mr. Fulmer. But the insubordination was that he was at a customer's house and he told the customer, I just don't feel like climbing poles today, and left. So that's insubordination, but if you leave a job before completing it, that also affects your productivity. And again, there are 14 other names on that list. And again, it's a- The use of contractor technicians was largely seasonal? Yes, I- And did it, other than differences in demand from year to year, was CL's practice with using contractors the same from 2011 through 2015? The practice in- Was there any sort of structural change in the use of contractors from Nextel and others? Your Honor, I believe that the demand is always there, and as you said, it's seasonal. As plaintiff even testified, as winter approaches, there's a need for fewer technicians, and so there isn't as much need over the winter. As far as their treatment of contractors, that did change after 2015, the way that they were supervised changed. I thought I remembered that, but for the years that encompassed the two incidents with- My understanding is- It was consistent? Yeah, yes, Your Honor. I think that it can change, if they're rolling out a new plan or a new program or new technology or something like that, that could result in shifts. Then where would I go on the record? Whose deposition or affidavit would I read for the structure of the relationships between CenturyLink and its various contractors and the union employees and the contractor technicians? Just kind of laying out the setup. You're talking about these various people that participated in the 60-minute process being a different process than your treatment of the union employees, technicians. Where would I go on the record to get the landscape? Your Honor, I don't have specific page sites, but Mr. Berth, who was the one who started the email chain saying his productivity is really low, he talks about the treatment of union employees being different from contractors, part of that being because the union employees, they have bargain for rights, so you can't just fire them after any certain period of time. I think Mr. Fry's deposition is in there too, and he probably talks about that as well. I think we've talked about another way that the plaintiff tried to show pretext in this case was to say that CenturyLink deviated from its policies and practices. He relies on the Riddouse case, Riddouse versus JBS in his reply brief, but that's really a similarly situated comparator case. In that case, the plaintiff was terminated for declining performance, and another employee, he pointed out, had just been reprimanded for it or suspended, something short of termination, and he used that to point out that the company's policy was not to terminate for declining performance, and so he was treated differently. Again, we don't have a similarly situated comparator in this case. Plaintiff also talked about, well, it was a deviation from policy for Mr. Buckholz to terminate him, but again, that's not the case. He wasn't terminated. Mr. Buckholz testified that he similarly played a part in sending home 15, 20 other contractors. For a bunch of reasons, including low productivity, quality of work, that kind of thing. He also claims that it's pretext that CenturyLink doesn't have a policy for a set number of jobs that its contractors are expected to finish as opposed to its union employees, but Mr. Berth testified that he expected both contractors and union employees to complete five to six jobs in a 10-hour workday. And plaintiff's witness, Mr. Howe, does say that there were a number of contractors that he is aware of, or he believes were sent home for low productivity. He just says they were given a longer period of time. So there can't be any dispute that there is an expectation of job completion for contractors. And again, Mr. Berth said that plaintiff's job completion rate was the lowest he'd seen for an employee or a contractor. Now I have a question on the standing issue. You won't have anticipated and may not even see the relevance of, but is there an answer and where would I find it to the question of whether CenturyLink is liable in tort to a Nextel technician who was injured in working on the CenturyLink line and collected workers' comp from Nextel? Your Honor, you're right. I didn't see that coming. I think that would probably. I just had an Iowa law case on the joint employer doctrine as it applies to that situation. Yeah, I think that would be a question of state law. And I'm a Missouri lawyer, so I can't profess any knowledge in that area. I'm sorry. You don't think there's anything in the record on that? No, I don't, Your Honor. Okay. My time is up if the Court has no more questions. Thank you. Thank you, Ms. Carver. Mr. Eller, we asked you a number of questions and I think we've gotten your time down under a minute, but we'll give you two minutes for your rebuttal. Appreciate that, Your Honor. First, Judge, looking at the case that I was trying to think of was the Springer v. Federal Home Loan case. The Court, Eighth Circuit there said the plaintiff just needs to show enough evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if the evidence does not disprove the articulated reason. I think the plaintiff was not successful in that case, but it's just an example of the flexibility of what's required to overcome this last part of the burden shifting on pretext. I think just a couple of quick points. The 14 names on the interrogatories, Mr. Buchholz and his deposition was not familiar with any of the names except for the former individual that was discussed by counsel. He had no idea who they were. I just want to say also the Court made a reference to a 60-minute decision process. It was actually 60 seconds. When counsel went through what Fry had had a phone call with Berth, none of that's really material because all that Mr. Buchholz had, all he had was the email. He didn't talk to anyone. He had the email, and I referenced the page site, but he had that email, and he took 60 seconds, and that was just about enough time for him to recognize the name. Mr. Engelhardt had a long, intimate relationship with Mr. Buchholz. They were practically pen pals. They sent eight emails to each other. They were both deposed in the Brennan case. All in 2011, or were they? I mean . . . Yes. Okay. They didn't have an intimate relationship in the Brennan litigation. Well, they knew . . . But you talked . . . intimate means they were dealing with each other. That obviously . . . Well, through counsel. Was it true in September and October of 2011? Are you referring to anything else I'm not aware of? Probably not, Your Honor. It's in the record. I just want to say that, or ask the rhetorical question, could a reasonable jury find retaliation in this case? Of course it could. Where's the evidence of the knowledge that Engelhardt had of . . . that turning into something that I'm out to get him. There's no way he's ever going to prosper after testifying or being a plaintiff against the company I work for. Where does one find that . . . that . . . Real briefly, Your Honor. Engelhardt, he's cited in the court summary judgment motion. He's listed as a witness for trial. He's deposed. He's an opt-in plaintiff. He provides evidence. They settle the case. Then he's fired. Then he sends a letter to the CEO about retaliation. Buchholz has to get legal counsel. I mean, he knows who this guy is. He's forced to concede that he can come back, although he doesn't. I mean, I think that's enough to create in an individual the idea that Mr. Engelhardt is a nemesis that he does not want, as his colleague said, to have any contact with. As I said, I think this case is dripping with retaliation. A reasonable jury could easily find the retaliation. We ask that the court reverse and remand it for trial. Thank you, Your Honors. Thank you, Mr. Elwood. The court wishes to thank both counsel for the arguments you provided to the court this morning. We will take the case under advisement and render decision in due course. Thank you. Thank you.